JASON M. FRIERSON
United States Attorney
Nevada Bar No. 7709
District of Nevada
JACOB H. OPERSKALSKI
Assistant United States Attorney
Nevada Bar Number 14746
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
PHONE: (702) 388-6336
jacob.operskalski@usdoj.gov
*Attorneys for United States of America*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 2:22-mj-00433-VCF |
| Plaintiff, | |
| v. | **Government's Response to Berk Eratay's Motion for Pretrial Release** |
| BERK ERATAY, | |
| Defendant. | |

**CERTIFICATION: The undersigned counsel certifies that this memorandum is timely filed**.

Defendant, Berk Eratay, is charged by Indictment for his role in a murder-for-hire conspiracy that resulted in death, in violation of 18 U.S.C. § 1958. Accordingly, if convicted, he faces a mandatory sentence of either life imprisonment or the death penalty. As a defendant with strong foreign ties, significant assets at his disposal, and who facilitated a murder for his own financial benefit, Eratay poses a significant risk of nonappearance and is a danger to the community. There are no release conditions that would sufficiently mitigate those risks, and Eratay should be detained pending transfer to the charging district for trial.

\\

## I.     Background

### A.  Procedural History

On May 19, 2022, a federal grand jury sitting in Burlington, Vermont returned a sealed indictment charging Berk Eratay and Serhat Gumrukcu with murder-for-hire conspiracy with death resulting, in violation of 18 U.S.C. § 1958. The indictment alleges that Eratay conspired with Serhat Gumrukcu and others between May 2017 and February 2018 to cause interstate travel and to use and cause another to use interstate facilities in aid of a plot to pay someone to kill Gregory Davis. In separate, related indictments, the grand jury charged Jerry Banks with kidnapping Davis and charged Aron Ethridge with conspiring to kidnap Davis. The charging documents outline a conspiracy among these four men to have Banks travel to Vermont to murder Davis for money. The conspiracy accomplished the goal when Davis was murdered in January of 2018.

Eratay was arrested on May 24, 2022, at his home in Las Vegas, Nevada. He appeared before Magistrate Judge Cam Ferenbach on May 26, 2022. The government moved for detention, but upon defendant's request, the detention hearing was continued until May 31, 2022. On May 27, 2022, Eratay filed a motion for pretrial release, ECF Doc. 6.

### B.  Factual Background[1]

The government's evidence establishes that Gregory Davis was killed in January 2018 after he was kidnapped from his Vermont home by a person falsely claiming to be a United States Marshal. In the early investigation of the case, Serhat Gumrukcu was identified as a likely suspect involved in the murder because Gumrukcu and his brother, Murat Gumrukcu, were the only people who appeared to have a dispute with Davis that

---

[1] The facts contained in this memorandum are primarily drafted by the lead prosecutor in the District of Vermont, Assistant U.S. Attorney Paul Van de Graaf for use in this response.

would potentially be a motive for Davis's execution. In 2017, Davis was threatening the Gumrukcus about going to the FBI with evidence that the Gumrukcus were defrauding him in a multimillion-dollar oil deal that the Gumrukcus had entered into with Davis in early 2015. The Gumrukcus failed to perform on the deal and had made various claims about their attempts to perform. Davis believed that the Gumrukcus had lied to him about various matters. During 2017, Serhat Gumrukcu was facing felony fraud charges in California state court. One aspect of those fraud charges involved bounced checks Serhat Gumrukcu had provided to the middleman in the oil deal, Gregory Gac. On the bounced checks, Serhat Gumrukcu falsely called himself "HRH Serhat Gumrukcu," a reference to "His Royal Highness."

That same year, 2017, Serhat Gumrukcu was putting together a successful deal that came together soon after the murder, namely, his significant ownership stake in a biotech company, Enochian Bioscience. Gumrukcu therefore had a strong motive to prevent Davis from reporting yet another fraud, and likely threatening the Enochian deal. At present, Serhat Gumrukcu appears to own over $100 million worth of Enochian stock. In May 2022, about a week before his arrest, Serhat Gumrukcu generated $2 million in cash from an Enochian stock sale.

Neither Serhat nor Murat Gumrukcu had traveled to Vermont to personally kill Davis, so the most likely plot involved a hired killer. Murat Gumrukcu, who lives in Turkey, visited the United States between December 2017 and March 2018. He was staying at Eratay's former apartment in Las Vegas at the time of the murder. Federal agents executed a search warrant at Eratay's apartment before Murat left the United States. Both Gumrukcus were interviewed in early 2018 about the murder, denying any involvement. Indeed, Murat Gumrukcu falsely denied contact with Gregory Gac, the middleman in the

3

oil deal. Serhat Gumrukcu falsely minimized his involvement in the oil deal. Murat Gumrukcu has not returned to the United States since March 2018.

After these interviews, the government investigation entered a long covert stage during which law enforcement worked to identify the hitman. That investigation began to bear fruit in 2020, when Jerry Banks was identified as a suspect. As described in affidavits that will be submitted prior to the detention hearing, the government investigation built a strong case against Banks. Banks, however, had no relationship with either Serhat Gumrukcu or Gregory Davis. Thus, the government looked for evidence identifying individual(s) connecting Banks and Gumrukcu.

The government discovered a chain connecting them: Banks was friends with Aron Ethridge, who was friends with Eratay, who worked for Gumrukcu. Multiple pieces of evidence supported the link. Banks met with Ethridge on various occasions in late 2017 as the murder scheme was being finalized. Ethridge was the first person Banks telephoned after the murder. Ethridge did not appear to have direct contact with Gumrukcu, but he did have contact with Eratay. Indeed, the first call Ethridge made after receiving the post-murder call from Banks was to Eratay's phone. Ethridge also had no connection with Davis. Eratay was the obvious link between Ethridge and Gumrukcu.

The government also developed substantial corroboration of Eratay's role in the conspiracy. Eratay's bank records reveal over $150,000 in wire transfers from Turkish accounts controlled by Gumrukcu between June and October of 2017, as the murder scheme was building. Eratay carefully and secretly transformed those funds into cash at the same time. Further, Eratay's email account showed that he documented personal information about Davis in July 2017, including his full name, date of birth, place of birth, and cell phone with a Vermont area code.

Between 2018 and 2022, the government investigation remained covert. The coconspirators, from Banks to Gumrukcu, likely thought that they had gotten away with the murder. In April 2022, the government chose to take overt steps. On April 6, 2022, Banks was arrested in Wyoming. During a custodial interview, Banks made a number of false exculpatory statements. The next day, Ethridge was approached by law enforcement. As noted in the affidavits that will be submitted prior to the detention hearing, although he denied knowledge of any scheme in his initial consensual interview, Ethridge soon reached out to law enforcement to come clean about his role. Ethridge admitted that he hired Banks to kill Davis and that he was in turn hired by Eratay (his former neighbor and friend for years) and Gumrukcu to find someone to murder Davis. Ethridge's admissions are highly credible, as they are consistent with the other evidence in the case, and because Ethridge has no motivation to falsely implicate himself in a murder. Ethridge has since been indicted and remains detained. The government anticipates that he will be a witness at trial against Eratay, Gumrukcu, and Banks.

At the same time, federal agents interviewed Eratay at his home, as Eratay acknowledges. He spoke willingly to federal agents, but in doing so, made a number of false exculpatory statements, including a denial of knowing anything about Davis.

## II.   Legal Standard

### A.  Standard of Review and the Bail Reform Act

The Bail Reform Act requires the least restrictive conditions possible to assure the defendant's appearance and the safety of the community. *See* 18 U.S.C. § 3142(c)(1)(B). If there is no condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of any other person and the community, the defendant shall be detained pending trial. *See* 18 U.S.C. § 3142(e).

5

To determine whether conditions would reasonably assure the defendant's appearance and the safety of any other person and community, § 3142(g) provides four factors to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by defendant's release. For a defendant's risk of flight, the government must prove by a preponderance of the evidence that the defendant will not appear as required. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). As for a defendant's danger to any person or the community, the government must show by clear and convincing evidence that no pretrial conditions could reasonably assure the public's safety. *Id.*

### B.  Basis for the Government's Detention Motion

The government is moving for detention pursuant to:

i.  18 U.S.C. § 3142(f)(1)(A) as this case involves a crime of violence for which a maximum term of imprisonment of ten years or more is prescribed;

ii.  18 U.S.C. § 3142(f)(1)(B) as this is an offense for which the maximum sentence is life imprisonment or death;

iii.  18 U.S.C. § 3142(f)(2)(A) as there is a serious risk that Eratay will flee; and

iv.  18 U.S.C. § 3142(f)(2)(B) as there is a serious risk that the Eratay will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

\\

**III.    Argument**

    **A.  Eratay poses a risk of flight**

        Eratay poses a substantial risk of flight based on compelling facts. He is charged with a crime carrying a mandatory minimum sentence of life imprisonment and the possibility of the death penalty. He has substantial ties outside the United States and limited ties in the United States. He has access to significant funds to hide, to obtain false documents, and to conduct concealed travel. All of the statutory factors focusing on risk on flight counsel for detention. Common sense dictates that Eratay would hide or flee rather than spend the rest of his life in jail or face the death penalty.

        The indictment charges Eratay with conspiracy to murder for hire with death resulting. This offense carries a penalty of, at a minimum, mandatory life imprisonment. The offense is death-penalty eligible. The Attorney General has not yet decided whether to seek the death penalty. The very real prospect of Eratay spending the rest of his life in prison provides him with a compelling incentive to flee.

        Moreover, as outlined below, Eratay's offense involved detailed planning over the course of many months, as well as deceit, deception, and subterfuge. Eratay received tens of thousands of dollars from a Serhat Gumrukcu account in Turkey. Eratay filtered some of these funds through an account shared with a Ukrainian national who was absent from the United States during the time of this illicit bank activity. Eratay, who acted as Gumrukcu's business assistant on various matters, then turned the funds into cash, withdrawing it in amounts less than $10,000, obviously attempting to avoid currency reporting requirements. Ethridge admitted to law enforcement that the conspirators communicated by ThreeMa, an encrypted communication application. Eratay has training and experience in computer and software technology.

1    The government has assembled strong evidence during this ongoing investigation.

2    The government has attached the affidavit in support of the complaint authorizing the

3    arrest of Jerry Banks, the person hired by Eratay and Ethridge to kill Gregory Davis. Prior

4    to the detention hearing, the government will submit an April 2022 affidavit in support of

5    search warrant authorizing a broader search of two of Eratay's email accounts (this

6    affidavit also incorporates two 2020 search warrant affidavits for Eratay's email account).[2]

7    Those documents paint a compelling case.

8        Eratay notes that he has known about the investigation for years but has not fled.

9    When recently interviewed by federal agents, however, he presumably still thought that he

10   had gotten away with the murder. Eratay spoke to federal agents without counsel. A few

11   days later, Eratay's new counsel contacted the prosecutors in Vermont, who did not

12   disclose the evidence that they had developed against Eratay. Eratay remained in the dark

13   about the government's intentions and evidence until he was arrested last week. He had

14   little motive to flee before he knew that the government had a strong case against him.

15       Eratay mistakenly downplays the significance of the strength of the government's

16   case against him. While in many cases this factor may not play a key role, it should here.

17   The only reason that a rich defendant facing life in prison would appear for trial is the

18   chance to win at trial. The more likely that defendant would be convicted, the more likely

19   that he would flee.

20       Eratay is a dual citizen of the United States and Turkey. His family resides in

21   Turkey. Eratay has lived in the United States for about a decade. He has no significant

22   personal connections in the United States other than Serhat Gumrukcu, whom Eratay

23

24   ───────────

[2] Undersigned counsel understands that the search warrant documents are currently under seal and the government will submit once unsealed by the court in the District of Vermont.

8

admitted was a long-time family friend. Both have backgrounds as magicians. He has close ties to the Gumrukcu family. Indeed, it appears that Eratay has relied principally on funds and work from Gumrukcu for years. In emails, he described himself as Gumrukcu's "assistant." Serhat Gumrukcu has substantial assets and ties throughout the Middle East. Eratay admitted to federal agents that he was given Enochian stock worth approximately $100,000 by Gumrukcu. Eratay has access to the resources to successfully hide in the United States or to obtain false travel documents and reside in a foreign country. Indeed, Gumrukcu has a strong motive to encourage Eratay to leave the country. In light of the evidence against Eratay, his main chance at avoiding a life sentence appears to be cooperating against Gumrukcu, and Gumrukcu has substantial resources to invest in an effort to avoid that development.

### B.  Eratay Poses a Danger to the Community

Eratay's alleged conduct is directly relevant to the danger he poses to potential witnesses: the evidence shows that he has hired someone to kill Davis as part of an effort to silence him, making a significant cash payment to secure the murder. When Eratay's own life and liberty are at stake, there is reason to believe he would act to kill or otherwise gain advantage in a criminal case. Conditions cannot be fashioned to sufficiently mitigate that danger.

### C.  Eratay's Insufficient Proposed Conditions of Release

Eratay has proffered several proposed conditions of release in an effort to counter the risk of flight and the risk to witnesses. ECF Doc. 6. The Court should find that the proposed conditions do not "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). None of the proposed conditions sufficiently diminish the risk of flight from a wealthy defendant with a

1   substantial incentive to flee, and none would prevent him from acting to harm potential

2   witnesses.

3          To begin with, Eratay presents his home as collateral for an appearance bond.

4   Eratay's current home provides no anchor for his appearance. According to the prosecution

5   team in Vermont, Eratay's bank records show that in late 2019, he contributed

6   approximately $140,000 towards the purchase price, which was financed by a sizeable

7   mortgage. The source of much of Eratay's contribution remains unclear. The bank records

8   show that prior to the closing, Eratay (1) wired approximately $50,000 into his US Bank

9   account from a foreign account, (2) received a loan from a third party for $30,000, and (3)

10  deposited $20,000 in cash. The source of the "equity" is not dispositive in any event. No

11  amount of money, even substantial funds, is worth keeping if one is going to spend the rest

12  of his life in jail.

13         Eratay offers to surrender his passports. The absence of a current, legitimate

14  passport would not stop a wealthy, tech-savvy defendant from successfully getting out of

15  the country and residing long-term in a foreign country. Eratay could easily enter Mexico

16  or Canada without a passport and without contact with a border official. More

17  significantly, as Eratay is alleged to have paid someone to facilitate a murder, it is certainly

18  possible he would be willing to purchase a false passport. Eratay could easily rely on any

19  number of people in Las Vegas, Los Angeles, or Turkey to fashion a fraudulent passport

20  sufficient for him to enter Mexico.

21         Eratay also proposes home confinement with electronic monitoring. That condition

22  is inadequate to mitigate the risk that Eratay would flee for several reasons. First, a

23  defendant can easily remove a monitoring device. At best, home confinement with

24  electronic monitoring would merely reduce Eratay's head start should he decide to flee.

10

Eratay could cross the Mexican border by car without travel documents in a matter of hours. Second, Eratay will need to travel regularly across the country for court appearances in Vermont. Electronic monitoring cannot effectively monitor this kind of travel. He could easily flee during any such trip. Third, it bears noting that Eratay has significant computer skills – the charging district has stated a concern that his knowledge could potentially help him "fool the electronic monitoring system into believing that he is home when he is already out of the country."

Finally, Eratay proposes that a friend, Halis Kaya, keep watch over him on behalf of the Court, but the Court should not find this sufficient. To begin with, Mr. Kaya cannot watch Eratay at every moment around the clock to the exclusion of attending to his own affairs. This guard proposal suffers from the same defects as electronic monitoring because Eratay could obviously slip away from Mr. Kaya. Eratay needs to be guarded, but the only guards that can effectively assure Eratay's appearance are correction officials. Moreover, the Court lacks strong grounds to place such trust in Eratay's close friend when considering that Eratay's flight would allow Eratay to avoid a lifetime in prison.

## IV.   Conclusion

The government respectfully requests that the Court detain Berk Eratay because he is both a flight risk and a danger to the community; no condition or combination of conditions will reasonably assure his appearance and the safety of the community.

\\

\\

DATED: May 30, 2022

JASON M. FRIERSON
United States Attorney
District of Nevada


*/s/ Jacob Operskalski*
JACOB OPERSKALSKI
Assistant United States Attorney
Attorneys for Plaintiff
UNITED STATES OF AMERICA